**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF TEXAS**
**FORT WORTH DIVISION**

| | | |
|---|---|---|
| **JAN C. HANKINS,** | § | |
| **PLAINTIFF,** | § | |
| | § | |
| **VS.** | § | **CIVIL ACTION NO. 4:05-CV-194-Y** |
| | § | |
| **JO ANNE B. BARNHART,** | § | |
| **COMMISSIONER OF SOCIAL SECURITY,** | § | |
| **DEFENDANT.** | § | |

**FINDINGS, CONCLUSIONS AND RECOMMENDATION**
**OF THE UNITED STATES MAGISTRATE JUDGE**
**AND**
**NOTICE AND ORDER**

This case was referred to the United States Magistrate Judge pursuant to the provisions of

Title 28, United States Code, Section 636(b).  The Findings, Conclusions and Recommendation of

the United States Magistrate Judge are as follows:

FINDINGS AND CONCLUSIONS

A.      STATEMENT OF THE CASE

Plaintiff Jan C. Hankins brings this action pursuant to Sections 405(g) and 1383(c)(3) of Title

42 of the United States Code for judicial review of a final decision of the Commissioner of Social

Security denying her claim for disability benefits under Title II and supplemental security income

or SSI benefits under Title XVI of the Social Security Act.   Hankins applied for SSI benefits and

disability insurance benefits on January 22, 2002, alleging disability beginning September 25, 1997.

(Tr. 34, 38). She met the requirements for disability insured status through the date of   the

administrative decision.

**Findings, Conclusions and Recommendation of**
**the United States Magistrate Judge–Page 1**

After the Social Security Administration denied her applications for benefits initially and on reconsideration, Hankins requested a hearing before an administrative law judge (the "ALJ"), and ALJ Stanley M. Schwartz held a hearing on December 3, 2003 in Dallas, Texas.  (Tr. 512).  Hankins was represented by counsel.  On April 30, 2004, the ALJ issued an unfavorable decision in which he found Hankins was not disabled or entitled to disability insurance or SSI benefits because she was capable of performing her past relevant work.  (Tr. 18-26).   The Appeals Council denied Hankins' request for review of her case, leaving the ALJ's decision to stand as the final decision of the Commissioner.  (Tr. 4).

B.      STANDARD OF REVIEW

The Social Security Act defines a disability as a medically determinable physical or mental impairment lasting at least twelve months that prevents the claimant from engaging in substantial gainful activity.  42 U.S.C. § 423(d), 1382c(a)(3)(A); *McQueen v. Apfel*, 168 F.3d 152, 154 (5ᵗʰ Cir. 1999).  To determine whether a claimant is disabled, and thus entitled to disability benefits, a five-step analysis is employed.  20 C.F.R. §§ 404.1520, 416.920. First, the claimant must not be presently working at any substantial gainful activity. Substantial gainful activity is defined as work activity involving the use of significant physical or mental abilities for pay or profit. 20 C.F.R. §§ 404.1527, 416.972.   Second, the claimant must have an impairment or combination of impairments that is severe. An impairment or combination of impairments is severe if it has such minimal effect on the individual that it would not be expected to interfere with the individual's ability to work. 20 C.F.R. §§ 404.1520(c), 416.920(c); *Stone v. Heckler*, 752 F.2d 1099, 1101 (5ᵗʰ Cir. 1985). At the third step, disability will be found if claimant's impairment or combination of impairments meets or equals an

impairment listed in the appendix to the regulations. *Id.* §§ 404.1520(d), 416.920(d). Fourth, if disability cannot be found on the basis of claimant's medical status alone, the impairment or impairments must prevent the claimant from returning to his past relevant work. *Id.* §§ 404.1520(e), 416.920(e). And fifth, the impairment must prevent the claimant from doing any work, considering the claimant's residual functional capacity, age, education, and past work experience. *Id.* §§ 404.1520(f), 416.920(f); *Crowley v. Apfel,* 197 F.3d 194, 197-98 (5th Cir.1999).

At steps one through four, the burden of proof rests upon the claimant to show he is disabled. If the claimant satisfies this responsibility, the burden shifts to the Commissioner at step five of the process to show that there is other gainful employment the claimant is capable of performing in spite of his existing impairments. *Crowley*, 197 F.3d at 198. If the Commissioner meets this burden, the claimant must then prove that he cannot in fact perform the work suggested. *Waters v. Barnhart*, 276 F.3d 716, 718 (5th Cir. 2002). A finding at any point in the five-step process that a claimant is disabled or not disabled is conclusive and terminates the analysis. *Masterson v. Barnhart*, 309 F.3d 267, 272 (5th Cir. 2002).

A denial of disability benefits is reviewed only to determine whether the Commissioner applied the correct legal standards and whether the decision is supported by substantial evidence in the record as a whole. *Leggett v. Chater*, 67 F.3d 558, 564 (5th Cir. 1995); *Hollis v. Bowen*, 837 F.2d 1378, 1382 (5th Cir. 1988). Substantial evidence is such relevant evidence as a responsible mind might accept to support a conclusion. *Boyd v. Apfel*, 239 F.3d 698, 704 (5th Cir. 2001). It is more than a mere scintilla, but less than a preponderance. *Id.* A finding of no substantial evidence is appropriate only if no credible evidentiary choices or medical findings support the decision. *Id.*

**Findings, Conclusions and Recommendation of
the United States Magistrate Judge–Page 3**

This Court may neither reweigh the evidence in the record nor substitute its judgment for the Commissioner's, but will carefully scrutinize the record to determine if the evidence is present. *Harris v. Apfel*, 209 F.3d 413, 417 (5th Cir.2000);  *Hollis*, 837 F.2d at 1383.

C.      ISSUES

Whether the determination that Hankins is capable of performing her past relevant work is supported by substantial evidence and in accordance with governing legal standards.

D.      ADMINISTRATIVE RECORD

1.      Treatment History

Hankins injured her low back in September 1997 while assisting her uncle from his wheelchair into a car.  (Tr. 113, 225, 394).  On examination, she exhibited decreased range of motion in her lumbar spine with tenderness, muscle spasms, and pain that radiated into her right leg. (Tr. 111-13).  Magnetic resonance imaging (an MRI) and a bone scan revealed no major findings. (Tr.129).  Conservative treatment measures consisting of physical therapy, pain medication, and muscle relaxers were prescribed.

In November 1999, Hankins was involved in a car accident.  (Tr. 152).  She complained of neck pain, mid-back pain, and continued low back pain.  Straight leg raise testing was positive at thirty degrees, and Hankins demonstrated a restricted range of motion in her cervical and thoracic spine.  Chiropractor Richard Chatfield diagnosed myofascitis[1] and prescribed regular chiropractic visits.  (Tr. 136-54).

---

[1]      Myofascitis is inflammation of the muscle and its fascia.  DORLAND'S ILLUSTRATED MEDICAL DICTIONARY 1170 (29th ed. 2000).

Hankins complained of back pain and worsening bronchitis when she saw her primary care physician, Jon Copeland, D.O., for check-ups in 2000 and 2001. Hankins was treated on multiple occasions for bronchitis with bronchial spasms and a productive cough with decreased breath sounds, wheezing, ronchi, and rattles. Copeland prescribed Prednisone, inhalers and an albuterol nebulizer, Advair, Flovent, and Combivent. Hankins was instructed to continue doing her breathing treatments on a regular basis. In 2001, Hankins was treated on several occasions for acute bronchitis or pneumonia that required her to take antibiotics. (Tr. 95, 99). She complained of coughing spells that aggravated her back pain and was given prescriptions in an attempt to control these episodes, but reported that her coughing spells persisted.

Pulmonary function tests administered in January 2002 reflected a one-second forced expiratory volume (FEV[1]) value of 1.43, which was 48% of Hankins' predicted value. (Tr. 97). Forced vital capacity (FVC) readings were 3.63 or 58% of the predicted value. (Tr. 97). The conclusion was severe obstruction with a lung age comparable to someone eighty years old. (Tr. 97). Hankins was treated for several episodes of acute bronchitis during 2002, and continued to report uncontrolled coughing episodes. (Tr. 91-101). Some coughing episodes were documented during office visits with Copeland. In May 2002, Hankins ran off the road while driving and blamed the accident on coughing triggered by bronchospasms.[2] (Tr. 94). Hankins participated in pulmonary rehabilitation programs designed to increase her breathing capacity and activity, and she was successful in meeting several goals for improvement.

During a consultative evaluation with David Ray, D.O., on June 10, 2002, Hankins reported

---

[2] Bronchospasms are spasmodic contractions of the smooth muscle of the bronchi. *Id.* at 246.

that she was able to dress herself, cook, and perform light housework.  (Tr. 225).  She was able to lift and carry a gallon of milk, but said that climbing stairs or walking for more than five minutes caused shortness of breath and made her cough.

Hankins was able to move about the examination room and exhibited a normal gait, but walked slowly.  She required assistance getting on and off of the examination table.  Hankins was able to heel-toe walk, but stated that it caused back pain.  She was unable to squat.  She also exhibited a restricted range of motion and muscle spasms in her lumbar spine, and she was tender to palpation of her lumbar spine.  Her reflexes were 2+/4.  Hankin demonstrated good finger dexterity, and she was observed handling small and large items without difficulty.  (Tr. 226).  A review of her lungs found no wheezing, rales or rhonci, and her lungs were clear to auscultation. A lumbar spine x-ray was interpreted as normal.  Ray diagnosed chronic low back pain and chronic obstructive pulmonary disease (COPD) by history.  (Tr. 226-27).

Hankins underwent additional pulmonary function tests in July 2002.  Her FEV[1] reading during these tests was 2.85 or 72% of predicted value, and her FVC reading was 3.49 or 94% of the value predicted.  (Tr. 230). Additional testing, referred to as DLCO measurements, was performed to determine the capacity of her lungs for diffusing carbon monoxide.  *See generally* 20 C.F.R. Part 404, Subpart P, § 3.00(F)(1).  The study was 48% of the referenced value.  (Tr. 231). Chest x-rays showed mild interstitial changes and remained unchanged from a previous study done in February. (Tr. 167).

Hankins also underwent a psychiatric consultative examination with Jyoti Patel, M.D., on July 10, 2002.  (Tr. 234).  Hankins stated that she did not think a psychiatric assessment was

<u>**Findings, Conclusions and Recommendation of**</u>
<u>**the United States Magistrate Judge**</u>**–Page 6**

necessary.  She advised that she had been hospitalized several times for treatment of depression and alcohol and drug rehabilitation programs, but she stopped drinking in 1995.[3]  She recounted a history of child abuse and several failed marriages and relationships.  (Tr. 235).  She reported that she had not worked since 1997 due to back problems.

On examination, Hankins was neatly dressed and groomed, but Patel noted that her affect was sad and tearful, with a depressed mood.  (Tr. 236).  Hankins said that her mind was constantly racing, but she had learned to ignore the racing thoughts.  She was oriented and able to name two out of four of the most recent United States' Presidents.  She was able to remember two out of four listed objects after five minutes, and she was able to recall five digits forward, but not in reverse.  Hankins was able to subtract a series of sevens beginning at one hundred.  Hankins reported that she tended to her own bathing and grooming, did her own laundry, made her bed, and attend AA meetings.  She liked to play with her dog, and she was able to take care of her houseplants.  (Tr. 236).

Patel diagnosed chronic depression, post-traumatic stress disorder based on childhood abuse, chronic pain, and a substance abuse disorder that was in remission.  Patel assigned Hankins a Global Assessment of Functioning (GAF) score of 40-50.[4]  (Tr. 236).

Copeland's progress notes from 2003 and 2004 reflect that Hankins was instructed to

---

[3]  Although unclear from Patel's reports, Hankins had not used illegal substances in more than two decades. (Tr. 394).

[4]  A GAF score of 41-50 reflects serious symptoms in social, occupational, or school functioning. DIAGNOSTIC AND STATISTICAL MANUAL OF MENTAL DISORDERS 34 (4th ed. 2000)(DSM-IV).  The ALJ discounted this score as inconsistent with the objective evidence of record.  (Tr. 21).

**Findings, Conclusions and Recommendation of
the United States Magistrate Judge–Page 7**

perform her albuterol breathing treatments every four hours.  (Tr. 465).  Hankins complained of coughing spells that exacerbated her back pain and problems with urinary incontinence, (Tr. 101, 465), and reported two episodes of syncope caused by bronchospasms and coughing.  (Tr. 466). She also exhibited signs of arthritis in her hands, including pain and slight swelling of the joints with decreased range of motion and flexibility.  (Tr. 94, 429).  Copeland prescribed Celebrex, which helped relieve Hankins' arthritis.  (Tr. 469).  Lumbar x-rays taken July 24, 2003 revealed mild straightening of the normal lumbar lordosis, osteopenia,[5] and a loss of disk space at L4-L5, but the other disks were within normal limits.  (Tr. 319).

Hankins was diagnosed with breast cancer in 2003 and underwent a radical mastectomy of her left breast in June 2003.[6]  (Tr. 347-49).  Hankins was subsequently involved in another car accident that injured her neck and left shoulder, and aggravated problems she was already having with her mastectomy site.  (Tr. 429-30).  Hankins complained of swelling in her left arm and limited range of motion in that arm.  (Tr. 429).

In addition to her physical problems, Hankins has a history of mental treatment with Mental Health and Mental Retardation (MHMR) services.  Psychiatrist NiNi Swe evaluated Hankins on April 16, 2003 after Hankins expressed in interest in taking an antidepressant.  (Tr. 394).  Swe noted that Hankins tended to be sarcastic, agitated and irritable.  Hankins expressed anger towards the Social Security office because she had been denied benefits.  Hankins complained of poor memory

---

[5] Osteopenia is a decrease in bone mass.  DORLAND'S at 1289.

[6] During her pre-operative physical, Hankins' lungs were clear with no rales, rhonci or wheezing, and no neurological deficits were noted.  (Tr. 363).

**Findings, Conclusions and Recommendation of
the United States Magistrate Judge–Page 8**

and concentration, and she described auditory and visual hallucinations. (Tr. 394). She said that she had been fired from her most recent job because she was frequently absent due to pain. (Tr. 394).

Swe noted that Hankins appeared to be in severe pain during the interview, but Hankins was oriented and her recent and remote recall was intact. (Tr. 396). Her immediate recall and judgment were assessed as fair. Swe questioned whether Hankins' reported hallucinations were of significance and noted that Hankins was unhappy about being denied social security disability benefits. Swe diagnosed major depressive disorder without psychotic features, alcohol abuse in remission, and post-traumatic stress disorder. Swe prescribed Lexapro for Hankins' depression.

Hankins remained anxious, depressed and irritable during the summer of 2003, and her dosage of Lexapro was increased after she had her mastectomy. (Tr. 391). In October 2003, Hankins told Copeland that she was having panic attacks in crowded environments. She felt nervous and cried easily. (Tr. 428, 429). During a visit to MHMR in February 2004, Hankins complained of anxiety in crowded places and stated that she was embarrassed when she had a coughing spell in public. Her therapist opined that she was gaining some insight into her symptoms. (Tr. 445-476).

Swe reassessed Hankins' mental health status on October 29, 2004, approximately six months after the ALJ's decision. (Tr. 433). Swe characterized Hankins as anxious, euphoric, labile, depressed, sad, and bizarre. She reported hearing voices and seeing shadows, and she was paranoid and prone to mood changes during the interview. Swe asked Hankins to promise not to take more medication than prescribed, but Hankins gave only a sarcastic response. Swe diagnosed major depressive disorder without psychotic features, post-traumatic stress disorder, and a borderline

**Findings, Conclusions and Recommendation of
the United States Magistrate Judge–Page 9**

personality disorder.  Swe assessed GAF scores between 41 and 50.  (Tr.  435).  Swe opined that Hankins was emotionally and mentally incapable of holding a job and needed social security assistance.[7]  (Tr. 434).

2.      Administrative Hearing

Hankins was born May 22, 1951.  (Tr. 34).  Hankins testified that she had a GED.  She had attended college part-time and obtained an associates degree in 2000.  (Tr. 517-18).  She had not worked since graduating from college.  Her most recent full-time job was with Child Protective Services, where she was employed as a case aide.  (Tr. 519).  Her job duties including clerical tasks, supervising parent-child visits, and transporting children to doctors' visits, foster homes, and school. (Tr. 519).  Her employer asked her to resign in 1997 because she was unable to fulfill her job duties after she injured her back.  (Tr. 520).  Hankins had also worked as a parts runner for a cellular telephone company, a liquor store cashier, a stocker, and an office clerk.  (Tr. 521-23).

Hankins resided with her parents.  She testified that she had difficulty climbing stairs because of her breathing problems and back pain.  (Tr. 528).  She had reduced the amount of driving she did after blacking out while driving due to a coughing spell.  (Tr .529).  Hankins also testified that her low back pain prevented her from walking, standing or sitting for prolonged periods. (Tr. 533).  She estimated that she could sit for fifteen to twenty minutes at a time.  She was unable to walk to the end of her driveway, a distance of approximately one-fourth of a mile, without stopping.  (Tr. 536).

Hankins  testified  that  her  pain  medication  provided  minimal  relief,  and  even  with

---

[7] Copeland also issued a statement dated December 1, 2004 in which he opined that Hankins was unable to work due to her combined impairments.  (Tr. 510).

**Findings, Conclusions and Recommendation of
the United States Magistrate Judge**–Page 10

medication, she required frequent breaks with any activity.  (Tr. 537-38).  In addition to medication, Hankins performed stretching exercises and used a heating pad to relieve her symptoms.  She testified that her coughing spells aggravated her back pain.  (Tr. 538-39).  Hankins had attempted to work as pizza delivery person and a personal attendant after her alleged disability onset date, but was unable to keep either job because of back pain and her clients' fear that her coughing would make them sick.  (Tr. 527-28, 530).

Hankins also testified that she had problems using her left arm and shoulder due to a mastectomy the previous summer and a shoulder injury she sustained in a car accident.  (Tr. 540). She testified that she had difficulty dressing herself and was unable to lift her left arm without the assistance of her right arm.  (Tr. 541-42).  Hankins is right-handed.  She testified that she was supposed to wear a special sleeve to minimize the swelling in her left arm, but had been unable to pay for the sleeve.

Hankins testified that she began having significant breathing problems in 2000, including chronic bronchitis that had developed into pneumonia on one occasion and persisted for more than a year.  (Tr. 543-44).  She saw her physician monthly for control of her lung problems, and she also administered her own breathing treatments at home.  (Tr. 544).  Each breathing treatment required ten to fifteen minutes to complete.  She had breathing treatments each morning, dressed herself, and took her dog for a walk.  (Tr. 545-46).  When she returned home from her walk, she would administer another breathing treatment and rest.  Afterward, she would prepare lunch and watch television.  Hankins said she used to read, but was no longer able to follow the plot.  (Tr. 550). Hankins testified that she had an attention deficit disorder that interfered with her ability to

**Findings, Conclusions and Recommendation of**
**the United States Magistrate Judge–Page 11**

concentrate.  (Tr. 551).

Hankins testified that she administered three to six breathing treatments a day, (Tr. 551), but still experienced shortness of breath.  She timed her telephone calls and limited her talking to six or eight minutes to avoid bronchial spasms and a coughing spell.   (Tr. 552).  She experienced bronchial spasms several times during the day and at night.   (Tr. 553).  Excessive heat or cold, deodorants, and air pollution triggered additional episodes.  (Tr. 557).

Although she initially did not think she had any mental impairments, Hankins later identified symptoms in her life, including rage and crying spells, that led her to seek assistance from MHMR.  (Tr. 561).  Despite medication, she continued to feel anxious and was uncomfortable sitting in her doctors' offices or attending church.         When questioned by the ALJ, Hankins testified that she previously smoked three packs of cigarettes each day and now smoked a pack of cigarettes daily, but she was trying to stop smoking completely on the advice of her doctor.  (Tr. 567-68).   She denied any other substance abuse.  (Tr. 571-72).

Vocational expert Tammie Donaldson also testified.   Donaldson testified that most of Hankins' previous jobs, including her work as a case aide and an office clerk, required light exertion[8] and were either unskilled or semi-skilled jobs.  (Tr. 574).  The ALJ asked Donaldson to consider

> a person of [Hankins'] age, education and work experience could sit for 15 to 20 minutes, would need to change positions by moving or scooting around or switching

---

[8]  Light work involves lifting no more than 20 pounds at a time with frequent lifting or carrying of objects weighing up to 10 pounds.  Even though the weight lifted may be very little, a job is in this category when it requires a good deal of walking or standing, or when it involves sitting most of the time with some pushing and pulling of arm or leg controls.  20 C.F.R. §§ 404.1567(b), 416.967(b).

**Findings, Conclusions and Recommendation of**
**the United States Magistrate Judge–Page 12**

her body in a chair. She might also have to get up and walk around and then would be able to return to the work function, and that lifting with both hands would not be a problem using her dominant arm or the right arm to help the left arm. And assuming that she did not have to lay down and go to rest during the day other than rest at — and let's assume she took a breathing treatment in the morning, she took a breathing treatment after lunch and then took a breathing treatment after work at night, and she also would be able to need to rest and take that treatment 10 to 15 minutes — 10 to 12 minutes at least once a day and possibly twice a day, and could not be around any kind of environmental hazards, any pollutions [sic], situations that would trigger her coughing. Would she be able to do any of her past work with that hypothetical?

(Tr. 575-76). Donaldson testified that Hankins' previous work as a case aide and her work as an office clerk would fit within the restrictions given by the ALJ. Donaldson testified that she was assuming that Hankins could take her breathing treatments and rest periods within scheduled work breaks. (Tr. 576). Standard work breaks generally contemplated a fifteen-minute break in the morning, thirty to sixty minutes for lunch, and another fifteen-minute break in the afternoon. (Tr. 576). Donaldson also testified that there were other sedentary or light jobs that Hankins could perform. Examples included blood donor assistant or order clerk. (Tr. 577). Donaldson testified that an employer was unlikely to tolerate an employee who had to take unscheduled breaks as frequently as four times a day due to coughing spells if this occurred on an ongoing basis. (Tr. 578).

    3.    ALJ Decision

The ALJ found that Hankins had not engaged in substantial gainful activity since her alleged onset date. (Tr. 19). He also found that Hankins' severe impairments included a chronic low back pain syndrome, chronic obstructive pulmonary disease, and Major Depressive Disorder. (Tr .20). However, the ALJ found that Hankins had no impairment or combination of impairments meeting or equaling the severity of any listed impairment. (Tr. 20). Instead, the ALJ found Hankins was

limited to light exertion and work that was either unskilled or at the lower end of semiskilled tasks. (Tr. 24). Based on the vocational expert's testimony, the ALJ determined that Hankins was capable of returning to her previous work as a case aide or office clerk. (Tr. 24). Accordingly, Hankins was not considered eligible for disability insurance or SSI benefits. (Tr. 25-26).

D.    DISCUSSION

1.    Residual Functional Capacity

Hankins contends that the ALJ's assessment of her residual functional capacity is unsupported by substantial evidence and reflects a selective view of the evidence. She also complains that the ALJ has drawn inferences and made medical determinations that are beyond his area of expertise.

a.    Pulmonary Function

Hankins asserts that the ALJ erred in not recognizing that her coughing spells and bronchospasms interfere with her ability to work. She complains that the ALJ chose to rely on one consultative examination report and ignore other documentation of her severe pulmonary problems.

Hankins contends that her pulmonary impairments meet or equal the requirements for a listed impairment, which mandates a finding of disability. The ALJ considered Hankins' pulmonary condition, but found that her pulmonary function studies did not approach the levels required by Listing 3.02, which addresses the severity requirements for chronic pulmonary insufficiency. (Tr. 20). *See generally* 20 C.F.R Part 404, Subpart P, App. 1, Listing 3.02. Substantial evidence, including Hankins' pulmonary function studies from July 2002 and additional diagnostic studies reflecting only mild interstitial changes, supports the ALJ's determination. The state agency medical

**Findings, Conclusions and Recommendation of**
**the United States Magistrate Judge–Page 14**

consultants who reviewed Hankins' record both initially and on reconsideration likewise found no impairment of listing-level severity. (Tr. 237-44, 263-70).

Hankins also contends that the ALJ erred in not recognizing the incapacitating nature of her coughing spells and episodes of bronchospasms as documented by treating sources.  The ALJ acknowledged that Hankins had pulmonary restrictions, but after considering the record, found that Hankins' impairments would not preclude light work activity.  He further found that Hankins needed to avoid excessive exposure to atmospheric irritants, but noted that this did not adversely affect most work because most jobs did not involve great amounts of dust or other irritants.  (Tr. 22). SOCIAL SECURITY RULING 85-15.   He also determined that Hankins' pulmonary function studies did not indicate a lung impairment that could be expected to produce the symptoms or limitations she alleged.  The ALJ was persuaded by evidence that Hankins' treatment regimen consisted of only conservative measures and routine management.  (Tr. 23).

It is not the court's function to reweigh the evidence in the record or substitute its judgment for the Commissioner's, but the court will carefully scrutinize the record to determine if substantial evidence is present. *Harris v. Apfel*, 209 F.3d 413, 417 (5th Cir.2000);  *Hollis*, 837 F.2d at 1383. Substantial evidence is present in this case to support the ALJ's assessment of the functional restrictions imposed by Hankins' pulmonary impairment and his determination that her impairment would not preclude light work activity.

b.    Mental Impairments

Hankins asserts that the ALJ's decisions does not reflect all of the mental limitations imposed by her depression, panic attacks and anxiety as recognized by the state agency medical

consultants.  She notes that her GAF scores are indicative of a serious impairment, but the ALJ

responded only by limiting her to unskilled or less skilled work due to impaired concentration.

Hankins asserts that the ALJ failed to follow the appropriate regulations in evaluating the

limitations imposed by her mental impairments.  (Plf. Br. at 2).  The Social Security disability

regulations outline a process (referred to as "the technique") to be used for evaluation of mental

impairments.  First, symptoms, signs, and laboratory findings are evaluated to determine whether

the claimant has a medically determinable mental impairment. 20 C.F.R. §§ 404.1520a(b)(1),

416.920a(b)(1).  Once an impairment is found, the administration will rate the degree of functional

limitation resulting from the impairment.  *Id*. §§ 404.1520a(b)(2), 416.920a(b)(2).  Four broad

functional areas are recognized:  (1) activities of daily living; (2) social functioning; (3)

concentration, persistence, and pace; and (4) episodes of decompensation.  *Id*. §§ 404.1520a(c)(3),

416.920a(c)(3).  After rating the claimant's functional limitations, the administration determines

whether the impairment is severe or not severe given the degree of functional loss found in the four

given areas.  *Id*. §§ 404.1520a(d), 416.920a(d).  When the degree of mental limitation in the four

given areas is none or mild, the mental impairment is generally not found to be severe unless the

evidence otherwise indicates more than minimal limitation in the claimant's ability to perform basic

work activities.  20 C.F.R. § 404.1520a(d)(1).

A review of the ALJ's decision reflects that the ALJ substantially followed the appropriate

technique.  The ALJ specifically addressed the state agency evaluation of Hankins' mental

impairments and gave significant evidentiary weight to the state agency assessment of Hankins'

degree of impairment in each of the four broad areas of functioning.[9]  (Tr. 21).  The ALJ found Hankins mildly impaired in her activities of daily living and social functioning; found her moderately impaired in her ability to maintain concentration, persistence or pace; and found no episodes of decompensation attributable to a mental impairment . (Tr. 21-22, 255).  The ALJ noted that the state agency reviewing psychiatrist had opined that Hankins was not significantly limited in several work-related areas and had assessed no areas of marked limitation.  (TR. 21). He concurred with the state agency medical consultants' determination that Hankins was capable of understanding and carrying out simple instructions, interacting with coworkers and supervisors, and adapting to routine changes in a work setting.  (Tr. 22, 261).  The ALJ also observed that Hankins' available MHMR records reflected only moderate symptoms of depression.  Accordingly, he concluded that Hankins retained the mental capability for competitive, remunerative work.[10]  (Tr. 22).

Hankins has not demonstrated that the ALJ failed to comply with the appropriate regulations and procedures in assessing Hankins' mental impairments, or that the ALJ's assessment of the functional limitations imposed by her mental impairments is unsupported by substantial evidence.

---

[9]  Findings of fact made by state agency medical and psychological consultants regarding the nature and severity of an individual's impairments are treated as expert opinion evidence from non-examining sources at the administrative hearing and Appeals Council levels of review. 20 C.F.R. §404.1527(f); SOCIAL SECURITY RULING 96-6p.  The administrative law judge and the Appeals Council are not bound by the state agency physicians' opinions, but may not ignore them and must explain the weight given to these opinions in their decisions.  SOCIAL SECURITY RULING 96-6p.

[10]  The ALJ also noted that Hankins' treating psychiatrist had suggested on one occasion  that Hankins might be exaggerating her symptoms because she was unhappy after being denied disability benefits at earlier stages of the administrative process.  (Tr. 21).

c.      Upper Extremity Restrictions

Hankins asserts that the she has additional severe impairments in the form of residual effects of her mastectomy and car accident, which limit her ability to use her left arm and shoulder. She further asserts that the ALJ ignored the limitations imposed by arthritis, which causes swelling and decreased movement and flexibility in her hands.

The ALJ did not address any residual effects from Hankins' mastectomy or car accident in his written opinion. During the administrative hearing, Hankins testified that she could reach overhead with her left arm if the weight was light, but she used her right (dominant) arm as an assistant when lifting her left arm. (Tr. 541). She testified that she thought she could push and pull items directly in front of her with her left arm, although not on a consistent basis. (Tr. 543). But even if the record establishes that Hankins has some impairment in her ability to use her left arm,[11] the ALJ's failure to address this issue in his written decision was harmless. During the administrative hearing, the ALJ specifically questioned the vocational expert about work available to a person capable of lifting with the dominant arm and using that arm to assist the non-dominant arm. (Tr. 575). The vocational expert testified that Hankins' previous work as a case aide or as an office clerk would accommodate this limitation. (Tr. 576).

As for Hankins' assertions of restrictions in her ability to use her hands, Hankins was observed during the consultative examination handling small and large items without difficulty. She testified during the hearing that she generally had no trouble using her fingers, although she had

---

[11]   The ALJ noted that the hearing was just six months after Hankins' mastectomy, raising a question of the permanency of Hankins' limited range of motion on her left side. (Tr. 541).

**Findings, Conclusions and Recommendation of
the United States Magistrate Judge–Page 18**

more swelling in her fingers in the morning.  (Tr. 543).  Moreover, Hankins reported to her treating physician that medication appeared to help the arthritis in her hands.  Impairments responsive to medication are not disabling.  *See* 20 C.F.R. §§ 404.1530, 416.930; *Johnson v. Bowen*, 864 F.2d 340, 348 (5th Cir. 1988).

Hankins has not shown that the ALJ erred in failing to incorporate additional upper extremity restrictions in her residual functional capacity assessment.

2.     Credibility Determination

Hankins complains that the ALJ did not evaluate her credibility in accordance with the applicable rulings and regulations, and erred in rejecting her subjective complaints of disabling pain and other symptoms.  She asserts that the ALJ's selective view of her treatment history was inappropriate, whereas a fair review of the objective record reflects that her complaints are consistent with the medical evidence.

In evaluating a claimant's subjective complaints, the ALJ first considers whether there is a medically determinable impairment that could reasonably be expected to produce the pain or other symptoms.  20 C.F.R. §§ 404.1529(b), 416.929(b);  SOCIAL SECURITY RULING 96-7p.  Once the impairment is found, the ALJ evaluates the intensity, persistence and limiting effects of the symptoms on the claimant's ability to do basic work activities.  20 C.F.R. §§ 404.1529, 416.929. A claimant's testimony about her symptoms must be consistent with the objective medical evidence and other available evidence.  *Id.*; 20 C.F.R. § 416.929.   In all cases in which pain or other symptoms are alleged, the administrative decision must contain a thorough discussion and analysis

of the objective medical and other evidence, including the individual's complaints of pain or other symptoms and the adjudicator's own observations. SOCIAL SECURITY RULING 95-5p. A claimant's statements as to her pain and other symptoms are not conclusive evidence of disability, but must be accompanied by medical signs and findings of a medical impairment that could reasonably be expected to produce the pain or other symptoms alleged and that would lead to the conclusion that an individual is disabled. 42 U.S.C. §423(d)(5)(A).

The ALJ reviewed Hankins' testimony, the consultative examination reports, and Hankins' treatment history. The ALJ agreed that Hankins had underlying impairments that could be expected to produce the symptoms alleged, but found Hankins' subjective complaints not entirely credible to the extent she alleged an inability to engage in any work activity. (Tr. 22-24). He also considered Hankins' sporadic work history that predated her alleged disability onset date and the report from one treating source who indicated Hankins might be exaggerating, which made him question whether her continuing unemployment was actually attributable to her medical impairments. (Tr. 23). He also noted that no treating source had recommended any work-related restrictions. (Tr. 23-24).

The ALJ sufficiently articulated a reasonable basis for finding Hankins' subjective complaints not wholly credible, and substantial evidence supports that determination.

3.      Vocational Expert Testimony and Past Relevant Work

Hankins contends that the ALJ did not follow the relevant administrative guidelines in analyzing the demands of Hankins' previous work and her ability to perform that work given her

current residual functional capacity (RFC).

RFC is what an individual can still do despite her limitations. SOCIAL SECURITY RULING 96-8p.  It reflects the individual's maximum remaining ability to do sustained work activity in an ordinary work setting on a regular and continuing basis.  *Id*.; *Myers v. Apfel*, 238 F.3d 617, 620 (5th Cir. 2001).  A regular and continuing basis is an eight-hour day, five days a week, or an equivalent schedule.  SOCIAL SECURITY RULING 96-8p.  RFC is not the least an individual can do, but the most.  *Id.*  The RFC assessment is a function-by-function assessment, with both exertional and nonexertional factors to be considered.  *Id*.  The ALJ is permitted to draw reasonable inferences from the evidence in making his decision, but presumptions, speculation, and supposition do not constitute evidence.  SOCIAL SECURITY RULING 86-8.

A claimant is considered not disabled when he retains the RFC to perform the actual functional demands and job duties for a particular past job, or the functional demands and job duties of that occupation as generally performed in the national economy.  SOCIAL SECURITY RULING 82-61.  The claimant is the primary source of vocational documentation, and the claimant's statements are generally sufficient to determine skill level, exertional demands, and nonexertional demands of a previous job.  SOCIAL SECURITY RULING 82-62.  For situations where available documentation and vocational resource materials are insufficient to determine how a particular job is usually performed, it may be necessary to obtain the services of a vocational expert.  SOCIAL SECURITY RULING 82-61. The ALJ must develop enough information about past work to permit a decision about a claimant's ability to return to that work, and must provide a rationale explaining how a decision was reached.

SOCIAL SECURITY RULING 82-62.

Here, the ALJ obtained the services of a vocational expert, who compared the requirements of Hankins' past relevant work with her current residual functional capacity and testified that Hankins' previous work fell within her given limitations. Although evaluation of a person's ability to return to past relevant work requires careful consideration of the interaction of the limiting effects of a claimant's impairments and the physical and mental demands of his past relevant work, the ALJ's written decision demonstrates that a sufficiently careful assessment was made in Hankins' case. *See generally* SOCIAL SECURITY RULING 82-62.

4.      Sustained Employment

Hankins contends that the ALJ erred in not addressing whether she was capable of sustained employment in light of her mental impairments and coughing spells. SOCIAL SECURITY RULING 96-8p defines residual functional capacity (RFC) as "an assessment of an individual's ability to do sustained work-related physical and mental activities in a work setting on a regular and continuing basis." SOCIAL SECURITY RULING 96-8p. *See also* 20 C.F.R. § 416.945(b). A regular and continuing basis is considered eight hours a day, five days a week, or an equivalent work schedule. SOCIAL SECURITY RULING 96-8p.

The Fifth Circuit has adopted the principles underlying Ruling 96-8p and decided that, in assessing RFC, the adjudicator must discuss the individual's ability to perform sustained work activities in an ordinary work setting on a regular and continuing basis. *Myers v. Apfel*, 238 F.3d 617, 620 (5th Cir. 2001). A finding that a claimant can perform substantial gainful activity requires

**Findings, Conclusions and Recommendation of**
**the United States Magistrate Judge–Page 22**

more than a determination that the claimant can find work and physically perform the job:  There must also be a determination that the claimant could hold whatever job he obtains for a significant period of time.  *Watson v. Barnhart*, 288 F.3d 212, 217 (5th Cir. 2002).  *See also Singletary v. Bowen*, 798 F.2d 818 (5th Cir. 1986).

On its face, the *Watson* opinion could be read as a mandate that every administrative decision include an express finding that the claimant can maintain employment.  *Watson*, 288 F.3d at 218.  However, the Fifth Circuit has clarified that the ALJ is not required to make separate findings when the evidence does not raise a question about a  claimant's ability to both obtain and maintain employment.  *See Dunbar v. Barnhart*, 330 F.3d 670 (5th Cir. 2003); *Frank v. Barnhart*, 326 F.3d 618, 621 (5th Cir. 2003).

Hankins asserts that her treating psychiatrist has opined that she is not emotionally or mentally capable of holding down a job, and also notes that the vocational expert has conceded that most employers would not tolerate persistent coughing fits.  Aside from being prepared several months after the ALJ rendered a decision, Swe's report appears to suggest that Hankins' condition prevents employment, not that her condition waxes and wanes.  The ALJ considered Hankins' mental impairments, but found that her consultative evaluation demonstrated that her mental impairments resulted in few significant limitations.  The ALJ was also concerned that Hankins was exaggerating some of her symptoms as a result of being denied benefits at earlier stages of the administrative process.

As for Hankins' pulmonary impairment, the ALJ found Hankins was limited to light work

**Findings, Conclusions and Recommendation of
the United States Magistrate Judge–Page 23**

with regularly scheduled work breaks and lunch breaks to accommodate Hankins' use of prescribed medication to control and treat her COPD.  He did not accept Hankins' contentions about her symptoms, which would include her complaints of being plagued by coughing fits throughout the day that would preclude employment.  (Tr. 23). Additionally, there is no indication that the ALJ failed to appreciate that the ability to maintain employment is a consideration inherent in any RFC assessment.  *See Dunbar*, 330 F.3d at 672.  The ALJ's failure to make an express finding that Hankins could sustain a modified range of light work activity does not warrant reversing the Commissioner's decision.

<u>RECOMMENDATION</u>

It is recommended that the Commissioner's decision be affirmed.

<u>NOTICE OF RIGHT TO OBJECT TO PROPOSED</u>
<u>FINDINGS, CONCLUSIONS AND RECOMMENDATION</u>
<u>AND CONSEQUENCES OF FAILURE TO OBJECT</u>

Under 28 U.S.C. § 636(b)(1), each party to this action has the right to serve and file specific written objections in the United States District Court to the United States Magistrate Judge's proposed findings, conclusions and recommendation within ten (10) days after the party has been served with a copy of this document.  The court is hereby extending the deadline within which to file specific written objections to the United States Magistrate Judge's proposed findings, conclusions and recommendation until February 20, 2006.  The United States District Judge need only make a *de novo* determination of those portions of the United States Magistrate Judge's proposed findings, conclusions and recommendation to which specific objection is timely made.

<u>**Findings, Conclusions and Recommendation of**</u>
<u>**the United States Magistrate Judge**</u>**–Page 24**

*See* 28 U.S.C. § 636(b)(1).  Failure to file by the date stated above a specific written objection to a proposed factual finding or legal conclusion will bar a party, except upon grounds of plain error or manifest injustice, from attacking on appeal any such proposed factual findings and legal conclusions accepted by the United States District Judge. *See Douglass v. United Services Auto Ass'n*, 79 F.3d 1415, 1428-29 (5th Cir. 1996)(en banc).

<u>ORDER</u>

Under 28 U.S.C. § 636, it is hereby ORDERED that each party is granted until February 20, 2006 to serve and file written objections to the United States Magistrate Judge's proposed findings, conclusions and recommendation.  It is further ORDERED that if objections are filed and the opposing party chooses to file a response, the response shall be filed within seven (7) days of the filing date of the objections.

It is further ORDERED that the above-styled and numbered action, previously referred to the United States Magistrate Judge for findings, conclusions and recommendation, be and hereby is returned to the docket of the United States District Judge.

SIGNED JANUARY 30, 2006.


   /s/  Charles Bleil
CHARLES BLEIL
UNITED STATES MAGISTRATE JUDGE


**Findings, Conclusions and Recommendation of**
**the United States Magistrate Judge**–**Page 25**